UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| GIAVANNA ROBERSON | : | Hon. Joseph H. Rodriguez |
| *Plaintiff*, | : | CIV. NO. 1:20-02765 |
| v. | : | |
| BOROUGH OF GLASSBORO; POLICE CHIEF FRANKLIN BROWN, JR.; DEPUTY CHIEF JOHN POLILLO; LIEUTENANT RYAN KNIGHT; SERGEANT BRUCE VIGLIOTTA; CORPORAL MIKE FANFARILLO; DETECTIVE JACK MANNING; OFFICER RICHARD HENRY; OFFICER THOMAS BRUYNELL, OFFICER SEAN AITKEN, | : | OPINION |
| *Defendants.* | : | |

| | | |
|---|---|---|
| ALTAIF HASSAN, | : | Hon. Joseph H. Rodriguez |
| *Plaintiff*, | : | CIV. NO. 1:20-02769 |
| v. | : | |
| BOROUGH OF GLASSBORO; POLICE CHIEF FRANKLIN BROWN, JR.; DEPUTY CHIEF JOHN POLILLO; LIEUTENANT RYAN KNIGHT; SERGEANT BRUCE VIGLIOTTA; CORPORAL MIKE FANFARILLO; DETECTIVE JACK MANNING; OFFICER RICHARD HENRY; OFFICER THOMAS BRUYNELL, OFFICER SEAN AITKEN, | : | OPINION |
| *Defendants.* | : | |

1

This matter is before the Court on the motions for summary judgment filed by Defendants Borough of Glassboro; Police Chief Franklin Brown, Jr.; Deputy Chief John Polillo ("Polillo"); Lieutenant Ryan Knight ("Knight"); Sergeant Bruce Vigliotta ("Vigliotta"); Corporal Mike Fanfarillo ("Fanfarillo"); Detective Jack Manning ("Manning"); Officer Richard Henry ("Henry"); Officer Thomas Bruynell ("Bruynell"); and Officer Sean Aitken ("Aitken") (collectively "Defendants") in the companion cases cited above.[1]  [Dkt. 18; Dkt. 17, respectively].  For the reasons discussed below, the Court will grant Defendants' motions.

## I. Background

The facts of this case are largely undisputed.  Defendants are the Glassboro Police Department and police officers employed there.  On Monday, October 1, 2018 around 4:30 p.m., Defendants Henry and Bruynell responded to a shoplifting incident at a T-Mobile retail store in the College Town Shopping Center in Glassboro, New Jersey (the "Shopping Center").  [Dkt. 17, SUMF ¶ 1].[2]  James Mitchell ("Mitchell"), a bystander in the shopping center, entered the store and informed Henry and Bruynell that "a male pointed a handgun at a vehicle in the complex and then got into the vehicle on the driver's side and drove away."  [SUMF ¶ 4].  Mitchell described the gunman's vehicle as a black Dodge Charger but did not provide the state or number on the vehicle's license plate or identify any other distinguishing features about the car.  [Dkt. 17-4 at 3–4].  Mitchell then pointed at a black Dodge Charger as it drove through the parking lot and

---

[1] Though Plaintiffs Roberson and Hassan filed separate complaints, the factual allegations are nearly identical and the motions for summary judgment filed by Defendants are nearly identical. For the sake of ease, the docket citations throughout this opinion refer to filings in the *Hassan* matter, 1:20-02769.

[2] "SUMF" refers to the statement of undisputed material facts which Defendants provided in connection with their motions under Local Rule 56.1.

identified it as the vehicle which the gunman entered. [SUMF ¶ 5]. Mitchell did not describe the gunman's race or physical attributes at that time.

Henry, Bruynell, and Mitchell exited the store as Henry advised other officers by radio of Mitchell's report. [SUMF ¶¶ 8–9]. Henry radioed that the Charger left the Shopping Center parking lot by travelling south on Donald Barger Boulevard. [Exh. D at 20:39:32–36]. Henry did not mention the driver's race or physical characteristics. [*See id.*]. Approximately thirty seconds later, Bruynell entered his patrol vehicle and drove toward Donald Barger Boulevard while Henry remained at the Shopping Center with Mitchell.[3] [SUMF ¶¶ 8–10; Dkt. 17-4 at 7]. As he turned south onto Donald Barger Boulevard, Bruynell stated that he "lost the direction" of the Charger and that he would "check the high school" located approximately two blocks south of the Shopping Center along Donald Barger Boulevard. [Exh. D at 20:40:28–34].

Defendant Aitken was in his patrol vehicle at a different end of the Shopping Center parking lot when he heard Henry's radio report. [SUMF ¶ 11]. Aitken saw a black Dodge Charger travelling south on Donald Barger Boulevard. Aitken followed the vehicle as it made a left onto Carpenter Street, which intersects with Donald Barger Boulevard approximately one-and-one-half blocks away from the Shopping Center. [SUMF ¶ 12; Dkt. 17-4 at 17]. Approximately seventy seconds after hearing Henry's initial report, and five seconds after Bruynell reported that he "lost the direction," Aitken announced that he believed "that charger" was on "Carpenter." [Exh. D at 20:40:38–44]. Hassan was driving this Dodge Charger and Roberson was a passenger.

---

[3] Approximately one minute elapsed between when Mitchell first identified the black Charger and when Bruynell began his pursuit.

Aitken followed this Charger through traffic for several blocks along with Defendant Manning, who joined the pursuit in an unmarked police vehicle. [SUMF ¶ 13]. Aitken activated his overhead lights and sirens and ordered the Dodge Charger to stop. [SUMF ¶ 14]. The Charger ultimately stopped on a street on Rowan's campus, an area "heavily populated with students and pedestrians. [Dkt. 19 at 6–7]. Bruynell arrived at the scene shortly thereafter. [Dkt. 17-4 at 7]. Defendants Polillo, Knight, Vigliotta, Fanfarillo, and Manning all arrived at the scene as well. [SUMF ¶ 16; Dkt. 17-4 at 7]. Defendants Aitken, Bruynell, Manning, Fanfarillo, and Vigliotta drew their firearms and pointed them toward the Charger. [Compl. ¶ 19; Dkt. 17-4 at 20]. Aitken ordered the passengers of the Charger to exit the vehicle one-by-one.[4] [SUMF ¶ 15]. Plaintiff and Roberson complied with orders and exited the vehicle. Vigliotta handcuffed Hassan and Roberson and placed them in separate police vehicles. [SUMF ¶ 17]. Plaintiffs do not allege, and video evidence does not show, that Defendants continued to point their weapons at Plaintiffs after Plaintiffs entered the police vehicles. Hassan consented to have his car searched. [SUMF ¶ 19]. Defendants searched the car, did not find a firearm, and released Hassan and Roberson. [SUMF ¶ 20]. The entire encounter lasted approximately thirty-four minutes.

Hassan and Roberson filed a complaint alleging excessive force in violation of Fourth Amendment rights under 42 U.S.C. § 1983 (Count I); negligent and intentional infliction of

---

[4] As these events unfolded at Rowan, Henry interviewed Mitchell at the Shopping Center. Mitchell described the gunman as "black" male who was "a little fat" and had "puffy hair." Comparing the timestamps of the Defendants' bodycam videos, Mitchell provided this description to Henry after the other officers had already ordered Plaintiffs to pull over and were in the process of ordering Plaintiffs to leave their car. [*Compare* Exh. C at 20:45:53–46:20 *with* Exh. D at 20:45:53–46:20]. After completing his interview with Mitchell, Henry followed up with another radio call where he did not mention the gunman's race or physical attributes. [Exh. C at 20:47:53–48:15). By that time, the officers at Rowan had already removed both Plaintiffs from their car and were searching the empty car. [*See* Exh. D at 20:47:53–48:15].

emotional distress (Count II); negligent hiring, training, and supervision (Count III); and violation of the New Jersey Civil Rights Act, N.J.S.A. § 10:6-1 *et seq.* ("NJCRA") (Count IV). [Dkt. 1].  The parties consented to dismissal of Counts II and III.  [Dkt. 8].  After discovery, Defendants filed the present motion for summary judgment on Counts I and IV.  [Dkt. 17].

## II. Legal Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  *Id.*  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp*, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a

genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Andersen*, 477 U.S. at 256–57.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

### III. Analysis

#### a. Plaintiffs' § 1983 and NJCRA Claims

In general, 42 U.S.C. § 1983 establishes a cause of action "against any person who, acting under color of state law, deprives another of his or her federal rights." *Wright v. City of Phila.*, 409 F.3d 595, 599 (3d Cir. 2005). To succeed on a claim under § 1983, a plaintiff must show "(1) the violation of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed or caused by a person acting under color of state law." *Lopez-Siguenza v. Roddy*, No. CIV. 13-2005 JBS/JS, 2014 WL 1298300, at *4 (D.N.J. Mar. 31, 2014) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).

The NJCRA "is a state law corollary to 42 U.S.C. § 1983—it creates a private right of action for the violation of civil rights secured under the New Jersey Constitution." *Armstrong v. Sherman*, No. CIV.09-716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010). For this reason, "[t]his district has repeatedly interpreted NJCRA analogously to § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) (collecting cases). Thus, "the Court will analyze Plaintiffs' NJCRA claims through the lens of § 1983." *Id. See also Norcross v. Town of Hammonton*, No. CIV. 04-2536 RBK, 2008 WL 9027248, at *4 (D.N.J. Feb. 5, 2008) ("This

Court sees no reason to conclude that in the context of a claim for excessive force during an arrest, the standard under the New Jersey Constitution for evaluating those claims is different from that under the United States Constitution." (citations omitted)).

There is no dispute that Defendants acted under the color of state law when they ordered Plaintiffs to stop and exit their car at gunpoint. The only issue is whether Defendants violated Plaintiff's constitutional rights in doing so. Plaintiffs allege that Defendants "deprived Plaintiff[s] of their right to be free from excessive and unreasonable use of force under the Fourth and Fourteenth Amendment of the United States Constitution."[5] [Compl. ¶ 25]. Thus, the specific question before the Court is whether Defendants used excessive force and violated Plaintiffs' Fourth Amendment rights when they pointed guns at and handcuffed Plaintiffs.

The right to be free from excessive force during a seizure emanates from the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). "A seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968). "Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force" that amounts to a violation of the arrestee's Fourth Amendment rights. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (citing *Edwards v. City of Phila.*, 860 F.2d 568, 572 (3d Cir. 1988)).

Use of force is excessive and therefore unconstitutional if it is "unreasonable." *Groman*, 47 F.3d at 634; *Curley*, 298 F.3d at 279–80. Determining whether use of force is reasonable "requires careful attention to the facts and circumstances of each particular case, including the

---

[5] Plaintiffs do not allege a constitutional violation for wrongful arrest.

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Other factors include whether the force applied caused injury,

> the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the police officers' action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*McNeil v. City of Easton*, 694 F. Supp. 2d 375, 392 (E.D. Pa. 2010) (citing *Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005)). Courts must weigh these factors objectively and "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97 (citations omitted).

"[T]he use of drawn guns may give rise to a Fourth Amendment excessive force claim." *Donahue v. City of Hazleton, Pa.*, No. 3:14-CV-01351, 2020 WL 4461240, at *3 (M.D. Pa. Apr. 13, 2020), *report and recommendation adopted sub nom. Donahue v. City of Hazleton*, No. CV 3:14-1351, 2020 WL 4445988 (M.D. Pa. Aug. 3, 2020) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995)). However, "[t]here is no per se rule regarding when the use of drawn guns and handcuffs prior to a formal arrest would constitute excessive force. Rather, the use of guns and handcuffs 'must be justified by the circumstances.'" *Pikel v. Garrett*, 55 F. App'x 29, 32 (3d Cir. 2002) (quoting *Baker*, 50 F.3d at 1191–95).

Defendants concede that they seized Plaintiffs but argue that they are entitled to summary judgment because the seizure was lawful. Defendants first argue that they had probable cause to arrest Plaintiffs and that probable cause is a complete defense to § 1983 claims predicated on Fourth Amendment violations. [Dkt. 17-1 at 15]. This argument misses the mark, even if

8

Defendants had probable cause to arrest Plaintiff.  It is true that probable cause is a complete defense to some Fourth Amendment claims, namely, claims of wrongful arrest.  *See Anderson v. Creighton*, 483 U.S. 635, 663–64 (1987) (Stevens, J., dissenting); *see also Groman*, 47 F.3d at 634–35.  But Plaintiffs allege excessive force.  Excessive force claims concern the reasonableness of the force used in effectuating an arrest "notwithstanding the existence of probable cause to arrest."  *Graham*, 490 U.S. at 394 (discussing *Garner*, 471 U.S. at 5).  In other words, having probable cause to arrest an individual does not permit officers to use unreasonable force in carrying out that arrest.  Thus, Defendants cannot avoid an excessive force claim by demonstrating that they had probable cause to arrest Plaintiffs.

Defendants next argue that their use of force did not amount to a constitutional violation because it was objectively reasonable under the circumstances.  [Dkt. 17-1 at 18–19]. Considering the events as they unfolded, the Court agrees.

Defendants Henry and Bruynell received an eyewitness report that an individual brandished a firearm in a retail parking lot at approximately 4:30 p.m. on a Monday afternoon and drove away in a black Dodge Charger.  Henry reported that the Charger left the parking lot and drove southbound on Donald Barger Boulevard.  Although Bruynell lost visual contact with the Charger, Aitken identified a black Dodge Charger travelling southbound on the same road within approximately ninety seconds and two blocks of Henry's initial radio report.  Defendants ordered the vehicle to pull over, five officers drew their weapons, and ordered a then-unknown number of passengers out of the car.  Defendants placed the passengers in handcuffs, Plaintiffs inside police cars, and stopped pointing their weapons at Plaintiffs.  Defendants then searched the Charger and released Plaintiffs without physical injury after failing to recover a firearm.  No reasonable juror could find that Defendants acted unreasonably under these undisputed facts.

*Groman*, 47 F.3d at 634 ("[S]ummary judgment is appropriate if, as a matter of law, the evidence would not support a reasonable jury finding that the police officers' actions were objectively unreasonable."). *See also Samoles v. Lacey Twp.*, No. CIV.A. 12-3066 FLW, 2014 WL 2602251, at *8 (D.N.J. June 11, 2014) (finding it objectively reasonable for police officers, "acting on information that a gun was present and had been used in a threatening manner, to have their service weapons unholstered and targeted at Plaintiffs throughout the time necessary to secure Plaintiffs and ensure that there was no other individual present with the gun.").

The factors used to weigh the reasonableness of police conduct support this conclusion. With respect to the severity of the crime, brandishing and pointing a firearm may constitute a fourth-degree aggravated assault under New Jersey law. N.J.S.A. 2C:12-1b(4). And with respect to the issues of safety and dealing with armed and/or dangerous suspects, Defendants believed that they were pursuing an individual that was armed and may have already used a firearm in an unlawful manner. In such circumstances, "the government has a strong interest in ensuring that police are not forced to subject themselves to unreasonable danger while carrying out their duties." *Stiegel v. Peters Twp.*, 600 F. App'x 60, 66 (3d Cir. 2014). *See also id.* at 65 ("Several circuits have held that it is not a constitutional violation for a police officer to point a gun at an individual who poses a reasonable threat of danger or violence to police." (citations omitted)). As Plaintiffs acknowledge, Plaintiffs stopped their vehicle in an area of Rowan University's campus that was "heavily populated with students and pedestrians." [Dkt. 19 at 7]. Police officers are entitled to use force to mitigate a "public safety risk." *Plumhoff v. Rickard*, 572 U.S. 765, 776 (2014).

Although Plaintiffs did not resist arrest, Defendants placed Plaintiffs in handcuffs while Defendants searched Plaintiffs' car and did not use additional physical force to subdue Plaintiffs.

10

Plaintiffs do not allege or submit evidence to show that Defendants held Plaintiffs at gunpoint after placing them in handcuffs. *Cf. Baker*, 50 F.3d at 1193 (permitting excessive force claim where officers pointed guns at handcuffed individuals standing outside of an apartment while other officers executed a search warrant). Likewise, Plaintiffs do not argue or offer evidence that they suffered physical injury.[6] *See Courtright v. City of Battle Creek*, 839 F.3d 513, 519 (6th Cir. 2016) ("[W]hen there is no allegation of physical injury, the handcuffing of an individual incident to a lawful arrest is insufficient as a matter of law to state a claim of excessive force under the Fourth Amendment." (quoting *Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001))). Thus, both the resisting arrest and physical injury factors favor finding that the use of force was reasonable.

With respect to the "number of persons" factor, Defendants claim, and Plaintiffs do not dispute, that tinted windows prevented defendants from seeing into Plaintiffs' car and knowing how many people were inside.[7] [Dkt. 17 at 20]. Thus, while hindsight might suggest that a small team of armed officers was unnecessary to investigate the two unarmed Plaintiffs, the officers acted with the information available to them at the time. *Graham*, 490 U.S. at 396. Given the information available to Defendants, their decision to draw their firearms was "justified by the circumstances." *Pikel*, 55 F. App'x at 32.

With respect to the duration of the incident, the entire interaction was relatively brief. Approximately thirty-four minutes elapsed between when Defendants stopped Plaintiffs and when Plaintiffs were released. [*See* Exh. D]. Defendants only pointed their weapons for

---

[6] In fact, an officer loosened Roberson's handcuffs after she complained that they were too tight. [Exh. I at 20:55:38–20:56:18].

[7] Video evidence corroborates this claim, as officers continued to instruct passengers to exit Plaintiffs' vehicle after bringing both Plaintiffs into custody and after Roberson indicated that the car was empty. [Exh. K at 20:45:30–50].

11

approximately five minutes until they handcuffed Plaintiffs and seated Plaintiffs inside police vehicles.  *See Stiegel*, 600 Fed. App'x at 67 (finding that an officer drawing his handgun on suspects was reasonable in part because the officer's "use of his service weapon was limited—he displayed it for a short amount of time and holstered it once the situation was under control."). Plaintiffs do not argue or point to evidence that Defendants kept Plaintiffs in custody for more time than necessary to fully search Plaintiffs' vehicle.

Plaintiffs resist this reading of the facts principally because there is "no dispute that the officers' [sic] stopped plaintiffs' [sic] under the mistaken belief they were involved in criminal activity."  [Dkt. 19 at 20–21].  However, Plaintiffs have not identified any facts suggesting that Defendants could have or should have recognized their mistake and acted differently.  *Cf. Henry v. Purnell*, 652 F.3d 524, 532–33 (4th Cir. 2011) (finding that a disputed issue of material fact existed surrounding the reasonableness of an officer's mistaken use of force because "[t]here were several facts that [the officer] knew or should have known that would have alerted any reasonable officer" to his mistake).  The undisputed facts show that Defendants only learned of their mistake after they searched Plaintiffs' car and did not recover a gun.  The Court cannot rely on hindsight to fault Defendants' otherwise reasonable conduct.  *Graham*, 490 U.S. at 396.  *See also Henry v. Purnell*, 501 F.3d 374, 382 (4th Cir. 2007) ("[A] mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment." (citation and quotations omitted)).

Plaintiffs also argue that Defendants are not entitled to summary judgment because Defendants "made the reckless decision to pull over any black male in the vicinity driving a black charger [sic]…."  [Dkt. 27].  This argument unreasonably characterizes the facts as they unfolded.  Defendants did not pull over just "any black Charger" in the "vicinity."  Rather, they

12

pulled over a black Charger travelling on the same road and in the same direction as a black Charger potentially involved in a firearms offense, which Defendants located within approximately two minutes of the offense and within a few blocks of the offense. Further, Defendants did not mention the suspected gunman's race when they announced via radio that an armed man was driving a black Dodge Charger, or when they pursued or pulled over Plaintiffs' car.[8] [Exh. D at 20:40–20:43]. While Miller eventually described the suspect as a black male to Henry, he did not do so until after the other officers stopped Plaintiffs' vehicle. [Exh. C at 20:45:55–46:05].[9] It is undisputed that Defendants drove behind Plaintiffs' car through traffic and remained at a distance behind Plaintiffs' car when they ordered Plaintiffs to exit. It is also undisputed that Plaintiffs' vehicle had tinted windows that prevented Defendants from seeing inside the car. The record simply lacks evidence that Defendants arrested Plaintiffs recklessly or because of their race.

Taken together, the undisputed facts demonstrate that no reasonable juror could find that Defendants acted unreasonably when arresting Plaintiffs. While Defendants mistakenly subjected Plaintiffs to a frightening and frustrating encounter, the record is devoid of evidence to show that Defendants violated Plaintiffs' Fourth Amendment rights under the circumstances. As a result, Plaintiffs' § 1983 and NJCRA claims cannot survive summary judgment.

---

[8] To reach this conclusion, the Court carefully reviewed the contemporaneous bodycam footage and audio, where the officers repeatedly refer to a black Dodge Charger without any reference to the driver's race or physical appearance. These recordings "clearly contradict" Plaintiffs' claim that Henry instructed officers to search for a black male driving a black Dodge Charger. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[9] After speaking with Defendant Henry by phone, Defendant Vigliotta described the Shopping Center suspect's physical characteristics to the other Defendants at Rowan after they had already taken Plaintiffs into custody. [*See* Exh. K at 20:51:48–52:00]. Vigliotta did not mention the suspect's race.

### b. Qualified Immunity

Even if Plaintiffs' § 1983 and NJCRA claims could survive summary judgment, Defendants' qualified immunity would defeat these claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Qualified immunity "shields federal and state officials from money damages" unless plaintiffs can establish "(1) that the [government] official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"To be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Diana v. Oliphant*, 441 F. App'x 76, 80 (3d Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). *See also Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007) ("The question at this second step is whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001))). Qualified immunity therefore protects "all but the plainly incompetent or those who knowingly violate the law." *Olson v. Ako*, 724 F. App'x 160, 164 (3d Cir. 2018) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986)). "[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." *Id.* at 211.

14

Both prongs of this test require the Court to find that qualified immunity shields Defendants from liability.  As discussed above, Plaintiffs have failed to identify evidence showing that Defendants violated Plaintiffs' Fourth Amendment rights by using force that was objectively unreasonable under the circumstances.  Even if a reasonable juror could find a Fourth Amendment violation, Plaintiffs' right not to be placed at gunpoint and handcuffed during the investigation of a firearms offense was not "clearly established."  Plaintiffs have not cited—and the Court is unaware of—any case law stating that police conduct analogous to Defendants' constitutes a Fourth Amendment violation.  *See City of Tahlequah, Oklahoma v. Bond*, No. 20-1668, 2021 WL 4822664, at *2 (U.S. Oct. 18, 2021) (noting that "clearly established" rights must be established with "specificity" in Fourth Amendment cases).  To the contrary, courts in this circuit have refused to find Fourth Amendment violations where police officers used analogous or stronger force.  *See, e.g.*, *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (finding no excessive force where a SWAT team used "Rambo-type" behavior to arrest four individuals where the officers had been advised that "at least one of the men … had used a gun in a violent episode which was still unaccounted for."); *Samoles*, 2014 WL 2602251, at *8 (finding that officers reasonably drew weapons when investigating a suspect accused of brandishing a firearm); *Wade v. Colaner*, No. CIVA 06-3715 (FLW), 2010 WL 1490590, at *9 (D.N.J. Apr. 13, 2010) (finding that an officer reasonably drew his weapon where there was a possibility that a driver pulled over for a traffic violation was carrying a firearm).  Because the evidence cannot show that Defendants violated Plaintiffs' clearly established Fourth Amendment rights, qualified immunity defeats Plaintiffs' § 1983 and NJCRA claims.

Plaintiffs have also failed to identify any evidence that Defendants were "incompetent" or "knowingly violated the law" when bringing Plaintiffs into custody at gunpoint.  *See Olson*, 724

15

F. App'x at 164.  At worst, Defendants made reasonable mistakes "in circumstances that [were] tense, uncertain, and rapidly evolving" based on the information available to them at the time. *Samoles*, 2014 WL 2602251, at *6 (quoting *Graham*, 490 U.S. at 396–97).  Qualified immunity protects Defendants under these circumstances.

### IV. Conclusion

For the reasons discussed above, the Court will grant Defendants' motions for summary judgment.  Appropriate orders will follow.


November 5, 2021                                         /s/ Joseph H. Rodriguez

                                                          Hon. Joseph H. Rodriguez, USDJ